**In re Vinessa ROBINSON, Debtor.**

**No. 01–37446.**

United States Bankruptcy Court, S.D. Ohio, Western Division at Dayton.

March 31, 2003.

David Hopper, Middletown, OH, for debtor.

John Paul Rieser, Dayton, OH, for trustee.

### MEMORANDUM OPINION

JOHN E. HOFFMAN, Jr., Bankruptcy Judge.

The issue presented in this contested matter is whether the Debtor's claimed exemption in the proceeds from the settlement of a personal injury claim should be denied due to her alleged concealment of the claim and other assets. For the following reasons, the Court concludes that the exemption should be denied.

This memorandum opinion constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52 (made applicable here by Fed. R. Bankr.P. 7052 and 9014).

### I. Jurisdiction

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. 28 U.S.C. § 157(b)(2).

### II. Factual and Procedural Background

Vinessa Robinson ("Robinson" or the "Debtor") is a 39–year–old single mother. Robinson is employed as a line foreman at Faurecia Exhaust Systems ("Faurecia"), where she supervises 25 to 30 employees. She earns approximately $40,000 annually. On October 17, 2001 (the "Petition Date"), Robinson filed a voluntary Chapter 7 bankruptcy petition.

In the six-month period preceding the Petition Date, misfortune befell the Debtor twice—each of these mishaps has a bearing on the present dispute. First, on May 3, 2001, Robinson was injured when she slipped and fell at a Save–A–Lot Foods store (the "Accident"). Before filing her bankruptcy case, Robinson retained the law firm of Dyer, Garafolo, Mann & Schultz ("DGM & S") to represent her in connection with the assertion of a personal injury claim arising from the Accident (the "Personal Injury Claim"). Second, Robinson suffered a casualty loss when the basement of her home was damaged by flooding on August 11, 2001 (the "Flood Loss"). On September 27, 2001 and October 5, 2001, State Farm Fire and Casualty Company ("State Farm") sent Robinson checks in the amounts of $9,144.19 and $855.81, respectively, to compensate her for the Flood Loss.[1] *See* Debtor's Exhibits A and B. She deposited these checks in her account at the River Valley Federal Credit Union (the "Credit Union Account"). The Credit Union Account had a balance of approximately $8,800 as of the Petition Date. Before the end of November 2001— over a month after the Petition Date— Robinson paid Mehaffie General Contrac-

---

1. These payments exhausted the policy's $10,000 limit.

602

tors ("Mehaffie") $8,404.89 to repair the flood damage to her home. She also paid a neighbor an unspecified amount to move furniture and tear out damaged floor tile in her basement. Robinson made these payments with the funds on deposit in the Credit Union Account.

Along with her bankruptcy petition, Robinson filed schedules of assets and liabilities and a Statement of Financial Affairs as required by 11 U.S.C. § 521(1) and Fed. R. Bankr.P. 1007(b)(1). On her "Schedule B—Personal Property," Robinson listed the following assets:

| TYPE OF PROPERTY | DESCRIPTION AND LOCATION OF PROPERTY | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY, WITHOUT DEDUCTING ANY SECURED CLAIM |
|---|---|---|
| 2. Checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives. | River Valley Federal Credit Union 815 Elliott Drive Middletown, OH 45044 | 300.00 |
| 4. Household goods and furnishings, including audio, video, and computer equipment. | Household Goods | 1,500.00 |
| 6. Wearing apparel. | Wearing Apparel | 300.00 |
| 11. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Itemize. | 401(k) Gain Sharing through employment at Faurecia Exhaust Systems, Inc., Debtor's employer | Undetermined |
| 23. Automobiles, trucks, trailers, and other vehicles and accessories. | 1997 Ford Escort 1998 Dodge Durango | 4,305.00 13,940.00 |
| 33. Other personal property of any kind not already listed. Itemize. | Personal earnings | Undetermined |

With the exception of the Ford Escort, the Debtor listed each of the foregoing assets on her "Schedule C—Property Claimed as Exempt." Robinson did not list the Personal Injury Claim either on Schedule B or C; nor did she disclose the existence of any other contingent or unliquidated claims. In fact, on Schedule B, Part 20, which requires a listing of "other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims," Robinson responded "None." Robinson also failed to disclose the Flood Loss, responding "None" to Question 8 on her Statement of Financial Affairs, which requires a debtor to list "all losses from fire, theft, other casualty, or gambling within one year immediately preceding the [Petition Date]...." Official Bankruptcy Form 7, Statement of Financial Affairs, Question 8 (emphasis deleted).

On December 13, 2001, John Paul Rieser, the Chapter 7 trustee (the "Trustee"), conducted a meeting of creditors pursuant to 11 U.S.C. § 341 (the " § 341 Meeting").

At the § 341 Meeting, the Trustee informed Robinson and her counsel that she would be required to turn over the non-exempt portion of any federal and/or state income tax refunds that she would receive for the 2001 tax year. The Trustee also requested that the Debtor produce documents to confirm bank account balances as of the Petition Date. On December 18, 2001, the Trustee sent a follow-up letter to Robinson confirming his request for documentation to establish Petition Date account balances. This letter reiterated the Trustee's demand that Robinson turn over her income tax refunds upon receipt. Robinson failed to produce the documents requested by the Trustee.

On January 10, 2002, Robinson telephoned the Trustee to protest his demand for turnover of her federal and state income tax refunds. During this telephone conversation, Robinson asked the Trustee if he also intended to take the proceeds from the settlement of the Personal Injury Claim. Until this conversation occurred, the Trustee was unaware of the existence of the Personal Injury Claim. Following his telephone conversation with the Debtor, the Trustee learned that DGM & S had negotiated a settlement of the Personal Injury Claim (without the necessity of filing a lawsuit) and was holding $19,714.58 in settlement proceeds in its trust account (the "Settlement Proceeds"). The settlement had been finalized after the § 341 Meeting.

Following the January 10, 2002 telephone conversation with Robinson, the Trustee requested that she amend her schedules to disclose the Personal Injury Claim and any other assets that were not listed in the original schedules. In response, Robinson filed amended Schedules B and C on February 15, 2002. In her amended Schedule B, the Debtor listed the Personal Injury Claim as an asset. She claimed an exemption in the Personal Injury Claim/Settlement Proceeds by way of her amended Schedule C, which provides:

> Debtor claims an exemption under 11 U.S.C. § 522(b)(2) and [Ohio Revised Code section] 2329.66(A)(12)(c) in the amount of $5,000.00 in the personal injury claim described in Debtor's Amended Schedule B above.

After receiving the Debtor's amended schedules, the Trustee contacted DGM & S and requested that the law firm turn over the Settlement Proceeds. DGM & S forwarded the Settlement Proceeds (without deducting its contingency fee) to the Trustee. In addition, on February 26, 2002, the Trustee filed his "Objection to Any & All Debtor's Claimed Exemptions Listed on Schedule C of the Petition" (the "Objection"). The Objection seeks entry of an order denying the Debtor's claimed exemption in the Settlement Proceeds and any income tax refunds that she would receive. The Objection asserts that Debtor's failure to disclose the Personal Injury Claim and tax refunds, either in her schedules or at the § 341 Meeting, was "a deliberate attempt to limit the ability of the [c]reditors to recover from the Debtor." Objection at 3. Robinson filed a response to the Objection (the "Response") in which she argues that "the unscheduled assets complained of (a future tax refund and a possible injury claim, both of an unknown amount) were both contingent and unliquidated [as of the Petition Date] and of the type that a person in the Debtor's position might not see as an 'asset' requiring disclosure." Response at 3. According to Robinson, her failure to disclose either the Personal Injury Claim or anticipated tax refunds was due to inadvertence rather than fraud. The Response further asserts that: (1) "it was the Debtor who voluntarily (if belatedly) disclosed the existence of both assets to the Trustee;" and (2) "Debt-

or promptly complied with the Trustee's request for 2001 tax returns and properly amended her schedules to include the [Personal] Injury Claim." *Id.*

In late March or early April 2002, Robinson received a federal income tax refund of approximately $3,200 and a state income tax refund of $272 (collectively, the "Refunds"). Robinson did not turn over the Refunds to the Trustee. Instead, she used the Refunds to pay household expenses.

A hearing on the Objection and Response originally was scheduled for May 16, 2002, but was continued until August 6, 2002 at the request of the parties. Although the Trustee and Debtor's counsel appeared at the continued hearing, the Debtor failed to attend. The parties again agreed to reset the hearing so that the Debtor would have the opportunity to appear and testify. The order resetting the hearing provided that if the Debtor failed to attend the rescheduled hearing, the Response would be overruled and the Objection granted.

On August 19, 2002, the Trustee filed a Motion to Compel Turnover and for Sanctions (the "Turnover Motion"). The Turnover Motion seeks entry of an order compelling the Debtor to turn over both the Refunds and the non-exempt equity in the Credit Union Account as of the Petition Date. In the Turnover Motion, the Trustee alleges that the combined total of the Refunds and the non-exempt funds in the Credit Union Account as of the Petition Date was $11,568.86.[2] Before he filed the Turnover Motion, the Trustee sent two letters to Robinson—dated May 2, 2002 and July 24, 2002—demanding that she turn over the Refunds and the funds in the Credit Union Account. The Debtor did not respond to either of these letters.

At the outset of the consolidated hearing on the Objection, the Response, and the Turnover Motion (the "Hearing"), Debtor's counsel informed the Court that Robinson did not oppose the Turnover Motion.[3] Thus, the only issue in dispute at the Hearing was whether the Debtor should be permitted to claim an exemption in the Settlement Proceeds pursuant to Ohio Revised Code § 2329.66(a)(12)(C).[4]

**2.** According to the Turnover Motion, the $11,568.86 amount sought by the Trustee consists of "petition date bank account funds on hand of $8,850.02, federal and state tax refunds received and held by the Debtor postpetition in the gross amount of $4,157.00 (federal) and $272.00 (state) (gross total of $13,279.02) minus tax pro-ration in the [D]ebtor's favor of $910.16 based on the petition date, and also minus $400.00 for the cash and $400.00 for the wild card exemptions claimed by the Debtor under 11 [U.S.C.] § 522 and [Ohio Revised Code] §§ 2329.66(A)(4)(a) and (A)(18)." Turnover Motion at 2 (emphasis deleted). The Debtor's unrebutted testimony established that her federal income tax refund was approximately $1,000 less than the amount alleged by the Trustee in the Turnover Motion.

**3.** In view of her disposition of both the Refunds and the cash on deposit in the Credit

Union Account, it is unclear why the Debtor agreed to the relief requested in the Turnover Motion—i.e., the turnover of property that she no longer possesses.

**4.** Section 2329.66(A)(12)(c) of the Ohio Revised Code provides:

Except in cases in which the person who receives the payment is an inmate, as defined in section 2969.21 of the Revised Code, and in which the payment resulted from a civil action or appeal against a government entity or employee, as defined in section 2969.21 of the Revised Code, a payment, not to exceed five thousand dollars, on account of personal bodily injury, not including pain and suffering or compensation for actual pecuniary loss, of the person or an individual for whom the person is a dependent.

Ohio Rev.Code Ann. § 2329.66(A)(12)(c) (Anderson 2001).

# 605

At the Hearing, the Trustee asserted that the claimed exemption should be denied based on the Debtor's bad faith, which he claims is evidenced by her failure: (1) to disclose either the Personal Injury Claim, the Refunds, or the Flood Loss; and (2) to turn over the Refunds. The Debtor, on the other hand, maintains that she did not intentionally conceal information from the Trustee. The Personal Injury Claim was not listed in her schedules, Robinson testified, because she believed that disclosure was not required. On cross-examination by the Trustee, Robinson testified as follows:

Q: With the Court's permission I'm going to show you your schedule that you filed in this case as identified at the 341 meeting and ask you on the second page under declaration of penalty of perjury if that's your signature?
A: Yes.
Q: And do you recall, in general, the 341 meeting that we had in the hearing room?
A: Yes, I do.
Q: And you do recall being sworn under oath, placed under oath?
A: Yes.

. . . .

Q: And do you recall me asking whether or not on the accompanying papers you had disclosed all of your assets and all of your liabilities?
A: Yes.
Q: And you told me you had, correct?
A: Yes.
Q: And I asked you if the statements were true and correct to the best of your knowledge and belief?
A: Yes, you did.
Q: And you told me they were?
A: Yes.
Rieser: What about the personal injury claim? Tell the Court and us why it is that you did not list that claim on your schedules?
Robinson: Just like I said, I didn't think I had to.
Rieser: Why did you believe you did not have to?
Robinson: Because it was my personal money I thought. I'm the one suffered the pain.

Hearing Transcript ("Tr.") at 17–18, 23.

Upon further cross-examination by the Trustee, Robinson testified that she listed other items of personal property on her schedules, claimed those items exempt, and had not been advised by her bankruptcy attorney, Fred Ross ("Ross"), that particular types of personal property need not be disclosed. Tr. at 23–26. Robinson also conceded that she did not accurately disclose the actual balance in the Credit Union Account as of the Petition Date. The Credit Union Account balance was much higher than usual on the Petition Date because Robinson had deposited the checks received from State Farm to compensate her for the Flood Loss. Robinson provided the following testimony regarding the Credit Union Account:

Rieser: And you listed on your schedule that you had three hundred dollars ($300) in that account, right?
Robinson: That's correct.
Rieser: Okay. And, in fact then, after we asked for . . . your bank statements, you had something over eight thousand dollars ($8,000) in that account, didn't you?
Robinson: Yes, I did.
Rieser: And tell the Court why you didn't list the eight thousand dollars ($8,000), . . ?
Robinson: 'Cause the eight thousand dollars ($8,000) was when I had a flood in my basement and it was from the insurance company, so I didn't think I had to list it. It wasn't for my needs. It was for my basement.
Rieser: Did you discuss with your attorney the fact that you listed on the bank account that you had three hundred dollars ($300) and that that was a number which you were deciding not to include in there amounts that came from the insurance company for your water damage?
Robinson: Why should I include it? It wasn't mine for my personal needs.

. . . .

Rieser: You made that decision yourself?
Robinson: Yes, I did.

Tr. at 20–22.

The following exchange between the Trustee and the Debtor relates to the Refunds:

Rieser: You also had some tax refunds that you received or were entitled to receive that you filed after the first of the year and that you received after the first of the year, correct?
Robinson: Yes.

. . . .

Rieser: What did you do with it?
Robinson: I spent it.
Rieser: Didn't you remember the statement of 341 that you were to turn that money over?
Robinson: Yes, I did. I'm a single parent.

> Rieser: And so you made the decision to spend it even though you knew you weren't supposed to?
> Robinson: Yes I did.

Tr. at 26–27.

Robinson testified that she and Ross had reviewed her bankruptcy schedules before they were filed. With respect to her liabilities, Robinson stated that she was advised by Ross to "go ahead and list, you know, [the debts that] I want to get off me, you know, and that's what I did." Tr. at 28. Robinson initially testified that she could not recall Ross's instructions concerning disclosure of her personal property in the schedules. Tr. at 29. However, in response to a direct examination question posed by David Hopper ("Hopper"), Ross's associate and Debtor's co-counsel,[5] Robinson conceded that in the process of completing her bankruptcy schedules, she and Ross had reviewed Schedule B on a line-by-line basis and Ross had specifically asked her whether or not she owned each of the types of personal property listed on the form:

> Hopper: I'm showing the Debtor Schedule B .... [D]o you recall whether [Ross] asked you, did he go through and say, okay, do you have—how much cash on hand do you have, how much do you have in the bank, and go through each one of these things? Do you recall if he did that?"
> Robinson: Yes, he did.

Tr. at 31.

### III. Legal Analysis

■ The filing of a petition under the Bankruptcy Code creates an estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). *See Owen v. Owen,* 500 U.S. 305, 308, 111 S.Ct. 1833, 114 L.Ed.2d 350 (1991) ("An estate in bankruptcy consists of all the interests in property, legal and equitable, possessed by the debtor at the time of filing, as well as those interests recovered or recoverable through transfer and lien avoidance provisions."). Section 541(a)(1)'s scope is very broad, *see United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205 n. 9, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983); *Chao v. Hosp. Staffing Servs., Inc.,* 270 F.3d 374, 382 (6th Cir.2001), encompassing both tangible and intangible property. Among the types of intangible property falling within § 541(a)(1)'s sweep are prepetition causes of action held by the debtor. *Demczyk v. Mut. Life Ins. Co. (In re Graham Square, Inc.),* 126 F.3d 823, 831 (6th Cir.1997) ("[P]roperty of the estate includes the debtor's interest in a cause of action." (citing *Cottrell v. Schilling (In re Cottrell),* 876 F.2d 540, 542 (6th Cir.1989))); *In re Degenaars,* 261 B.R. 316, 319 (Bankr.M.D.Fla.2001) ("Pursuant to 11 U.S.C. § 541, a trustee in bankruptcy succeeds to all causes of action held by a debtor at the time a bankruptcy petition is filed.").

■ The Code affords debtors the right to exempt certain property from the bankruptcy estate. 11 U.S.C. § 522(b); *Owen,* 500 U.S. at 308, 111 S.Ct. 1833 ("An exemption is an interest withdrawn from the estate (and hence from the creditors) for the benefit of the debtor. Section 522 [of the Code] determines what property a debtor may exempt."). Two purposes are served by allowing debtors to exempt property from their bankruptcy estate: "(1) to give the debtors a so-called 'grub-stake' to begin their fresh start and (2) to act as a safety net, so that the debtor and his family are not completely impoverished due to creditor collection action or bankruptcy such that they become wards of the state." *In re Sumerell,* 194 B.R. 818, 826

---

5. Although Hopper was listed on the petition as Robinson's attorney, the petition was signed by Ross.

(Bankr.E.D.Tenn.1996). Property remaining in the estate after completion of the exemption process is subject to administration by the Chapter 7 trustee for the benefit of creditors.

Section 522(b)(1) of the Code offers the debtor a choice between exempting either the property specified in § 522(d) or the property protected by federal nonbankruptcy law or state law, "unless the State law that is applicable to the debtor ... specifically does not so authorize...." 11 U.S.C. § 522(b)(1). Ohio has chosen to "opt out" of the federal exemption scheme; thus, Ohio residents who file for bankruptcy relief are limited to the exemptions provided under Ohio law. *See* Ohio Rev. Code Ann. § 2329.662 (Anderson 2001); *Storer v. French (In re Storer)*, 58 F.3d 1125, 1127 (6th Cir.1995) ("Ohio has replaced the federal exemptions with its own state exemptions, which are those generally available to debtors under Ohio's general debtor-creditor law."). A debtor may claim an exemption by filing a list of exempt property (on "Schedule C—Property Claimed as Exempt") at the time the petition is filed. 11 U.S.C. § 522(e). Federal Rules of Bankruptcy Procedure 1007 and 4003 establish procedures governing the filing of the list of exempt assets on Schedule C, the assertion of objections to a debtor's claimed exemptions, and the resolution of disputed exemption claims. An objection to a claimed exemption must be filed within 30 days after the conclusion of the meeting of creditors held under § 341 or within 30 days after any amendment to the schedule of property claimed as exempt. Fed. R. Bankr.P. 4003(b).[6] A party objecting to an exemption has the burden of proving that the exemption is not properly claimed. Fed. R. Bankr.P. 4003(c).

The essential first step in the process of determining what property may be withdrawn from the estate by exemption is the debtor's filing of a complete and accurate listing of all assets. Section 521(1) of the Code requires a debtor to file "a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs...." 11 U.S.C. § 521(1). *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir.2002) ("A debtor has an affirmative duty to disclose all of its assets to the bankruptcy court...."). In completing the required schedules, " 'debtors have [the] absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or unavailable to the bankruptcy estate.' This is because 'the bankruptcy court, not the debtor, decides what property is exempt from the bankruptcy estate.' " *Bensenville Cmty. Ctr. Union v. Bailey (In re Bailey)*, 147 B.R. 157, 163 (Bankr.N.D.Ill.1992)(quoting *In re Yonikus*, 974 F.2d 901, 904 (7th Cir.1992)). *See also Carlucci & Legum v. Murray (In re Murray)*, 249 B.R. 223, 231 (E.D.N.Y.2000) ("Property is not exempt by fiat of the debtor, but only through a process of compliance with the [Code's disclosure requirements].)"; *Garcia v. Coombs (In re Coombs)*, 193 B.R. 557, 563 (Bankr. S.D.Cal.1996) ("[S]chedules are to be complete, thorough and accurate in order that creditors may judge for themselves the nature of the debtor's estate.").

"[T]he disclosure obligations of consumer debtors are at the very core of the bankruptcy process and meeting these obligations is part of the price debtors pay for receiving the bankruptcy discharge."

**6.** The Trustee timely filed the Objection after Robinson amended her Schedule C to claim an exemption in the Personal Injury Claim.

*In re Colvin,* 288 B.R. 477, 481 (Bankr. E.D.Mich.2003). As the bankruptcy court noted in *North River Ins. Co. v. Baskowitz (In re Baskowitz),* 194 B.R. 839, 843 (Bankr.E.D.Mo.1996):

> [T]he dual purposes of a Chapter 7 bankruptcy case are to grant the honest debtor a discharge of his or her prepetition debts, and to provide a mechanism for the fair and orderly distribution of the debtor's assets that are subject to administration by the Trustee. These purposes are fully realized when a debtor complies with the requirement that he or she submit accurate and complete information concerning the identification of creditors and assets.

*See also Roudebush v. Sharp (In re Sharp),* 244 B.R. 889, 892 (Bankr. E.D.Mich.2000) ("The connection between the debtor's obligation to file complete and accurate schedules and the fair administration of the bankruptcy case is clear."); *In re Hyde,* 222 B.R. 214, 219 (Bankr. S.D.N.Y.1998) ("The obligation of full disclosure is crucial to the integrity of the bankruptcy process."); *In re Hogan,* 214 B.R. 882, 886 (Bankr.E.D.Ark.1997) ("[T]he proper operation of the bankruptcy system depends upon debtors' honesty...."); *United States v. Haught (In re Haught),* 207 B.R. 269, 271 (Bankr. M.D.Fla.1997) ("The veracity of the answers furnished by the Debtor is indispensable to the effective administration of the Debtor's estate.").

 Errors and omissions in a debtor's schedules and statements generally may be remedied by amendment. Federal Rule of Bankruptcy Procedure 1009(a) provides that debtors may amend their schedules "as a matter of course at any time before the case is closed." Although Rule 1009(a) is liberal, it does not afford debtors a completely unfettered right to amend deficient schedules and statements.

*Kaelin v. Bassett (In re Kaelin),* 308 F.3d 885, 889 (8th Cir.2002) ("[T]he policy of freely allowing amendment, while the case is still open, is not an absolute and can be tempered by the actions of the debtor or the consequences to the creditors."); *Arnold v. Gill (In re Arnold),* 252 B.R. 778, 784 (9th Cir. BAP 2000) ("[R]ule [1009] is liberal, but is subject to some judge-made exceptions...."); *In re Cudeyro,* 213 B.R. 910, 918 (Bankr.E.D.Pa.1997) ("[A] debtor's proffered amendments to exemptions are not to be automatically allowed, but may be reviewed with [an] equitable gloss...."). Courts have refused "to allow an amendment where the debtor has acted in bad faith or where property has been concealed." *Lucius v. McLemore,* 741 F.2d 125, 127 (6th Cir.1984). *See also In re Yonikus,* 996 F.2d 866, 872 (7th Cir.1993) ("Amendment [of schedules] may be denied upon a showing of bad faith or prejudice...."); *Stinson v. Williamson (In re Williamson),* 804 F.2d 1355, 1358 (5th Cir.1986) ("[T]he general rule is to allow liberal amendment of exemption claims, absent bad faith, concealment of property, or prejudice to creditors."); *Doan v. Hudgins (In re Doan),* 672 F.2d 831, 833 (11th Cir.1982)("[A] court might deny leave to amend on a showing of debtor's bad faith or prejudice to creditors."); *In re Asbury,* 263 B.R. 839, 840 (Bankr. S.D.Ohio 2001) ("[C]ourts may ... disallow an amendment where the debtor has acted in bad faith or has concealed property. Even in the absence of bad faith or concealment of property, an amendment might not be allowed if the objecting party could show a resulting prejudice to creditors." (citation omitted)).

 The rationale for these judicially-created exceptions to Rule 1009(a)'s permissive amendment policy has been expressed as follows:

> [A]lthough amendments before discharge are liberally allowed ... [the

debtors'] omissions from the initial list suggest that they meant to hide assets if they could get away with it; .... The operation of the bankruptcy system depends on honest reporting. If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive.

*Payne v. Wood,* 775 F.2d 202, 205 (7th Cir.1985), *cert. denied,* 475 U.S. 1085, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986). As the Seventh Circuit explained in *Payne,* absent a judge-made bad faith/concealment exception to temper Rule 1009(a)'s free right of amendment, no penalty would attach to a debtor's failure to make full and honest disclosure of assets. And as a result, the effective administration of the bankruptcy system would largely depend upon the Chapter 7 trustee's success in ferreting out undisclosed assets rather than the debtor's bona fides. But the Bankruptcy Code and Rules place the burden on the debtor to make full and complete disclosure, not on the trustee to engage in detective work. *See Mertz v. Rott,* 955 F.2d 596, 598 (8th Cir.1992) ("[T]he petition, including schedules and statements, must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts." (internal quotation marks omitted)); *Bay State Milling Co. v. Martin (In re Martin),* 141 B.R. 986, 997 (Bankr.N.D.Ill.1992) ("Bankruptcy [t]rustees lack the time and resources to play detective and uncover all the assets and transactions of their debtors."); *Holder v. Bennett (In re Bennett),* 126 B.R. 869, 875 (Bankr.N.D.Tex.1991) ("Candor, accuracy and integrity are required of a debtor in bankruptcy."). Thus, under the judge-made bad faith exception to Rule 1009(a), a debtor who fails to comply fully with the disclosure requirements imposed by the Code and Rules faces a penalty—forfeiture of the right to claim an exemption in the concealed property.

■ Relying on the judicially-created bad faith exception to Rule 1009(a), the Trustee asserts that the Court should disallow the Debtor's amendment of her Schedule C and deny her claimed exemption in the Personal Injury Claim/Settlement Proceeds. "Bad faith is determined by an examination of the totality of the circumstances." *Kaelin,* 308 F.3d at 889. *Accord Pope v. Clark (In re Clark),* 274 B.R. 127, 137 (Bankr.W.D.Pa.2002) ("[B]ad faith ... is determined by examining the totality of the circumstances."); *Gold v. Guttman (In re Guttman),* 237 B.R. 643, 651 (Bankr.E.D.Mich.1999) (same); *In re Hardy,* 234 B.R. 94, 95 (Bankr.W.D.Mo. 1999) (same); *In re Clemmer,* 184 B.R. 935, 942 (Bankr.E.D.Tenn.1995). A finding of bad faith is often premised upon a debtor's attempted concealment of an asset. *Kaelin,* 308 F.3d at 890 ("When it is discovered that a debtor has attempted to hide an asset, it will generally support a finding of bad faith."); *Arnold,* 252 B.R. at 785 ("The usual ground for a finding of 'bad faith' is the debtor's attempt to hide assets."); *Guttman,* 237 B.R. at 651 ("Bad faith may be found when a debtor attempts to conceal an asset.").

■ Based on the totality of the circumstances, the Court concludes that Robinson's attempted concealment of the Personal Injury Claim, the Refunds, and the cash in her Credit Union Account demonstrates her bad faith. Although she was injured and retained DGM & S as her personal injury counsel before the Petition Date, Robinson did not disclose the Personal Injury Claim as an asset on Schedule B. Rather, in response to the line in Schedule B requiring disclosure of "contingent and liquidated claims of every nature," the Debtor responded "None." The Debtor also failed to claim an exemption in the Personal Injury Claim on the original Schedule C filed with the petition. In signing her bankruptcy petition and sched-

ules, Robinson affirmed under penalty of perjury that she had read the papers and that the information contained in them was accurate, when it clearly was not. And at the § 341 Meeting, once more under oath, she failed to disclose the Personal Injury Claim to the Trustee and repeated her false statement that the bankruptcy schedules were complete and accurate.

Robinson attempted to hide other assets as well. She falsely reported a $300 balance in the Credit Union Account on Schedule B when in fact there was over $8000 on deposit as of the Petition Date. Robinson also appears to have sought to conceal the source of the funds in the Credit Union Account—i.e., the prepetition insurance payments from State Farm—by failing to disclose the Flood Loss in her Statement of Financial Affairs. Rather than turn the funds in the Credit Union Account over to the Trustee—which were property of her bankruptcy estate and subject to administration—the Debtor used the cash to repair the Flood Damage.[7] In addition, Robinson failed to disclose the Refunds on Schedule B or claim them exempt on Schedule C. And although

Robinson represented to the Trustee that she would turn over the Refunds upon receipt (which was her duty under § 521(4) of the Bankruptcy Code), she failed to do so, choosing to spend the money instead. This pattern of nondisclosure and noncooperation with the Trustee by the Debtor convinces the Court that her initial failure to report the Personal Injury Claim and the Refunds was in bad faith. In sum, Robinson's conduct in connection with this case clearly has not been consistent with that of the "honest but unfortunate debtor" the bankruptcy laws were designed to assist. *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)). To the contrary, Robinson has sought to gain the benefits of bankruptcy relief (here, the discharge of over $17,000 in unsecured debt), while at the same time attempting to avoid the obligations imposed by the Code on all Chapter 7 debtors—to make full disclosure and to turn over non-exempt assets for administration. *See In re Jeffrey*, 176 B.R. 4, 6 (Bankr. D.Mass.1994) ("A Chapter 7 case involves a *quid pro quo:* debtors receive a dis-

---

7. According to her counsel, this "case has gone horribly wrong for the Debtor. She went into this to discharge debts and now she's looking at potentially no discharge, no personal injury settlement.... She's rapidly heading for a position far worse than if she had never filed in the first place." Tr. at 55–56. While there was no testimony on this point, the Court suspects that if the Debtor had been more forthcoming with her counsel—by advising him that she had over $8,000, rather than $300, in the Credit Union Account, that such funds had been paid by State Farm to indemnify her for the Flood Loss, and that the cash was earmarked for the construction work required to repair the flood damage—she could have avoided the "horrible" result her counsel described. Robinson certainly would have been within her rights to have paid Mehaffie for its repair work before filing her bankruptcy case—using the insurance payments from State Farm that were

deposited in the Credit Union Account. Had payment to Mehaffie been made prior to the Petition Date, it clearly would not have been subject to avoidance as a fraudulent or preferential transfer. *See* 11 U.S.C. §§ 544, 547, and 548. Nor would a prepetition payment to Mehaffie have been characterized as a transfer made with "intent to hinder, delay or defraud a creditor" within the meaning of 11 U.S.C. § 727(a)(2)(A) and, thus, certainly would not have spawned an objection to discharge. Yet, because the State Farm insurance proceeds remained in the Credit Union Account on the Petition Date, they became property of Robinson's bankruptcy estate, *see* 11 U.S.C. § 541(a)(1), and subject to the Trustee's administration, *see* 11 U.S.C. § 704(1). Thus, with a modicum of pre-bankruptcy planning, the Debtor's filing could have been better timed and she would not find herself in her current predicament.

charge and, in exchange, make full disclosure about their financial affairs, especially their assets, and surrender their nonexempt assets to the trustee for liquidation and distribution among creditors.").

■ Robinson maintains that her failure to disclose the Personal Injury Claim and the Refunds was not due to bad faith on her part, arguing that an unliquidated personal injury claim and yet-to-be-received income tax refunds are not the type of assets "that a person in the Debtor's position... might see ... as requiring disclosure." Response at 3. But Robinson's contention that her failure to disclose the Personal Injury Claim and Refunds was based upon misunderstanding or simple inadvertence is simply not credible. During her testimony, the Debtor demonstrated that she is an intelligent and capable person who supervises 25 to 30 employees at her job as a line foreman, owns a home, and raises children. She gave clear and direct answers on both direct and cross-examination and appeared to comprehend the bankruptcy process. She understood the bankruptcy schedules well enough to list other items of personal property and claim them exempt. Robinson had competent bankruptcy and personal injury counsel and consulted with both when it was to her advantage.[8] In short, having observed her demeanor and assessed her credibility as a witness, the Court simply is not persuaded that Robinson failed to understand that disclosure of the Personal Injury Claim and the Refunds was required. Robinson testified that she did not consider the Personal Injury Claim to be "property" as of the Petition Date. Tr. at 32. But Robinson conceded on cross-examination that the reason she did not disclose the Personal Injury Claim on Schedule B was her belief that she was entitled to keep the Settlement Proceeds because she personally had suffered the physical pain caused by the Accident. This testimony belies the Debtor's contention that her nondisclosure of the Personal Injury Claim was due to inadvertence. By her own admission, Robinson made the conscious decision not to disclose the Personal Injury Claim based on the belief that her right to the Settlement Proceeds was superior to that of the bankruptcy estate. But, in completing their schedules, debtors are not free to decide unilaterally whether to report or omit an asset based on their subjective judgment that the asset should not have to be made available to satisfy the claims of creditors. *See Colvin*, 288 B.R. at 483 ("Debtors cannot be permitted to exempt property by self-help. Court approval is required and debtors are prohibited from any action that circumvents that

8. The DGM & S firm frequently is retained as prepetition personal injury counsel by consumer debtors who later seek bankruptcy relief in this Court. As a result, the firm is often employed as special counsel, either for the Chapter 7 trustee in liquidation cases, or the debtor in Chapter 13 proceedings. Indeed, DGM & S is employed with such frequency that it has retained an experienced local bankruptcy practitioner to prepare and file the applications seeking approval of the firm's employment as special counsel in order to ensure compliance with the requirements imposed by 11 U.S.C. 327(e), Fed. R. Bankr.P. 2014, and LBR 2014–1. The fact that no application has been filed seeking approval of DGM & S's employment in this case indicates that the firm was not apprised of the Debtor's bankruptcy filing. This also suggests that Robinson intended to conceal the Personal Injury Claim from the Trustee and creditors. *See Yonikus*, 996 F.2d at 873 (affirming bankruptcy court's disallowance of exemption based on its finding that debtor's "employ[ment of] different law firms for the personal injury claims and the bankruptcy" and "[failure to] tell his bankruptcy attorney about the personal injury [or] ... the personal injury attorneys about his bankruptcy" demonstrated debtors "inten[t] to fraudulently conceal the existence of his ... personal injury actions from the Trustee and the Court" (internal citation omitted)).

process."); *Bailey,* 147 B.R. at 163 ("Allowing debtors the discretion to not report . . . property usurps the role of the trustee, creditors, and the court by denying them the opportunity to review the factual and legal basis of debtors' claims. It also permits dishonest debtors to shield questionable claims concerning an asset's value and status as an exemption from scrutiny."); *Am. State Bank v. Montgomery (In re Montgomery),* 86 B.R. 948, 959 (Bankr. N.D.Ind.1988) ("If there is any doubt or uncertainty whatsoever as to a possible interest in any property, the asset should be scheduled with an appropriate explanation. . . ."). Having admittedly made the deliberate decision not to report the Personal Injury Claim, the Debtor cannot credibly maintain that nondisclosure resulted from mere inadvertence.

■ Robinson's contention that her belated disclosure of the Personal Injury Claim should preclude a finding of bad faith is equally unpersuasive. The Trustee learned of the existence of the Personal Injury Claim in the context of a telephone conversation with Robinson that she initiated in order to discuss the Refunds. In this conversation, after indignantly protesting his demand for turnover of the Refunds, Robinson asked the Trustee if he would attempt to take the Settlement Proceeds from her as well. This single, spontaneous utterance by the Debtor—particularly given the context in which it was made—does not persuade the Court that Robinson made a conscious decision to "come clean." When viewed against the backdrop of her entire pattern of conduct in this case (the series of false statements under oath concerning the Personal Injury Claim, the Refunds, and the Credit Union Account balance as of the Petition Date, plus the unauthorized *postpetition disposition of the Refunds* and the cash in the Credit Union Account), the fact that Robinson belatedly disclosed the Personal Injury Claim is simply not sufficient to overcome the countervailing evidence that amply supports a finding of bad faith. *See In re Lundy,* 216 B.R. 609, 610–11 (Bankr. E.D.Mich.1998) (holding that debtor's belated disclosure of a personal injury claim at second meeting of creditors held following conversion of case to a Chapter 7 proceeding did not negate finding of bad faith where the debtor had failed to report the claim in either the original or amended schedules filed in the Chapter 13 case and failed to disclose its existence at the first meeting of creditors conducted by the Chapter 13 trustee).

Based upon the foregoing, the Court concludes that the Trustee has met his burden of proving that the Debtor's nondisclosure of the Personal Injury Claim was in bad faith.[9] A separate order shall be entered sustaining the Objection and denying the Debtor's claimed exemption in the Settlement Proceeds.

IT IS SO ORDERED.

---

**9.** As noted above, the party objecting to an exemption—here, the Trustee—has the burden of proving the exemption is not properly claimed. Fed. R. Bankr.P. 4003(c). The law is not entirely clear as to whether bad faith must be shown by a preponderance of the evidence or clear and convincing evidence. Several courts have held that in order to prevail on an objection to a debtor's claimed exemption on bad faith grounds, the objecting party must demonstrate bad faith by clear and convincing evidence. *See, e.g., Yonikus,* 996 F.2d at 872 ("Bad faith . . . must be shown by clear and convincing evidence."); *In re St. Angelo,* 189 B.R. 24, 26 (Bankr.D.R.I.1995) (same); *Kobaly v. Slone (In re Kobaly),* 142 B.R. 743, 748 (Bankr.W.D.Pa.1992) (same). In the Court's view, the better-reasoned authority holds that the preponderance-of-the-evidence standard of proof applies in exemp-

tion litigation, whether the objection to the claimed exemption is made on bad faith or other grounds. *See, e.g., In re Daniels,* 270 B.R. 417, 422 n. 2 (Bankr.E.D.Mich.2001) ("[T]he preponderance of the evidence standard rather than the 'clear and convincing' standard governs objections to exemptions."); *In re Lusiak,* 247 B.R. 699, 702 (Bankr. N.D.Ohio 2000) (holding that "burden of proof is placed upon the party contesting the objection to prove, by a preponderance of the evidence, that at the time of the filing of the bankruptcy petition, the debtor was not entitled to claim the propounded exemption"); *Hunter v. Patton (In re Patton),* 200 B.R. 172, 175 (Bankr.N.D.Ohio 1996) (same). The cases holding that a preponderance-of-the-evidence standard governs contested objection proceedings are consistent with the Supreme Court's decision in *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), which established that the appropriate burden of proof in § 523 dischargeability actions is preponderance of the evidence. *Grogan* holds that there is a presumption that the preponderance-of-the-evidence standard applies absent a clear directive from Congress that "it intended to require a special, heightened standard of proof," or the implication of "particularly important individual interest and rights." *Id.* As the bankruptcy court noted in *Daniels,* the conclusion that the preponderance standard applies in exemption litigation is "further reinforced by the Supreme Court's statement in *Grogan* that it was 'unpersuaded by the argument that the clear-and-convincing standard is required to effectuate the "fresh start" policy of the Bankruptcy Code.'" *Daniels,* 270 B.R. at 422 n. 2 (quoting *Grogan,* 498 U.S. at 286, 111 S.Ct. 654). The Ninth Circuit Bankruptcy Appellate Panel in *Arnold v. Gill (In re Arnold),* 252 B.R. 778, 784 & n. 10 (9th Cir. BAP 2000) questioned, in dicta, the continued vitality of cases requiring a party objecting to an exemption to establish by clear and convincing evidence that the exemption was improperly claimed. The *Arnold* court noted that it would be anomalous to apply a heightened standard of proof in exemption litigation when the less exacting preponderance standard has been held applicable to objections to discharge, which involve a much more severe sanction than loss of exemption rights. *See Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams),* 31 F.3d 389, 393–94 (6th Cir.1994) (holding that an objection to discharge under § 727(a) requires proof by a preponderance of the evidence); *Beauchamp v. Hoose (In re Beauchamp),* 236 B.R. 727, 730 (9th Cir. BAP 1999) (same). The Court need not decide whether the preponderance-of-the-evidence or clear-and-convincing standard of proof governs in contested exemption proceedings. Under either standard, the evidence presented by the Trustee is sufficient to support a finding of bad faith.