**In re Harvey J. GUIKEMA and Debra L. Guikema, Debtors.**

No. 04–55750.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

April 14, 2005.

Nicholas W. Jones, Delaware, OH, for Debtors.

Susan L. Rhiel, Columbus, OH, Chapter 7 Trustee.

### MEMORANDUM OPINION

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

This contested matter arises from the objection ("Objection") filed by Susan L. Rhiel, the Chapter 7 trustee ("Trustee"), to Debra L. Guikema's claim of an exemp-

tion in a VALIC retirement annuity ("Annuity"). Under § 2329.66(A)(10)(b) of the Ohio Revised Code, a "person's right to receive a payment under any pension, annuity ˙or similar plan" is exempt to the extent that the payment is "reasonably necessary for the support of the person and the person's dependents." Ohio Rev. Code Ann. § 2329.66(A)(10)(b) (Anderson 2001 & Supp.2003) ("Ohio Exemption Statute"). In determining the exemptibility of retirement funds under either the Ohio Exemption Statute or its federal counterpart, 11 U.S.C. § 522(d)(10)(E) ("Federal Exemption Statute"), bankruptcy courts have uniformly applied the 11–factor test approved by the Sixth Circuit Bankruptcy Appellate Panel ("BAP") in *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 723 (6th Cir. BAP 1999) to assess whether the funds are reasonably necessary for the support of debtors and their dependents. Having considered the factors listed by the BAP in *Hamo*, the Court concludes that the Annuity is not reasonably necessary for the Debtors' maintenance and support. The factors figuring prominently in the Court's analysis are the Debtors' age and good health, their current and anticipated future income, their anticipated retirement income from other sources, and, most importantly, their ability to replace the Annuity and save additional sums for retirement if they make reasonable adjustments to their current budget. In reaching the conclusion that the Annuity may not be exempted under Ohio Rev.Code § 2329.66(A)(10)(b), the Court rejects the Debtors' contention that the "reasonably necessary" language contained in both the Ohio and Federal Exemption Statutes was primarily designed to preclude high-salaried professionals and executives from exempting retirement funds and thus should not limit Mrs. Guikema's exemption in this case.

This memorandum opinion constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52 (made applicable here by Fed. R. Bankr.P. 7052 and 9014).

## I. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. 28 U.S.C. § 157(b)(2).

## II. Factual and Procedural Background

### A. The Debtors and Their Employment History

Harvey and Debra Guikema (collectively, "Debtors;" individually, "Mr. Guikema" or "Mrs. Guikema") filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on April 14, 2004 ("Petition Date"). As of the Petition Date, Mrs. Guikema was 50 years old and had been employed as a registered nurse at Grady Memorial Hospital ("Grady Memorial") in Delaware, Ohio for 13 years. At the evidentiary hearing on the Objection ("Hearing"), Mrs. Guikema testified that she earns approximately $60,000 a year and receives regular, annual increases in salary.

Mr. Guikema is 52 years old and currently is self employed as a photographer. His monthly net income is approximately $300. He has been so employed since the closing of Focal Point, a photography shop in Delaware that Mr. Guikema operated along with a business partner. It was the failure of this start-up business that precipitated the Debtors' Chapter 7 filing. As of the date of the Hearing, Mr. Guikema also worked as salesperson in training—on a "commission-only" basis—for NRC Corporation ("NRC"), a collection agency, but had yet to receive any commission income from NRC. Mr. Guikema anticipated that he would leave his position with NRC

shortly and seek alternative employment. Before launching the Focal Point venture, Mr. Guikema worked for Cord Camera, a large chain of camera stores based in central Ohio. While employed there, Mr. Guikema contributed to Social Security.

The Debtors are in good health. They have no dependents; both of their children are married and attend post-graduate institutions.

## B. The Debtors' Assets and Liabilities

The Debtors own a single-family residence in Delaware, Ohio, which they value in their schedules at $135,000 ("Residence"). The Residence is over-encumbered: Delaware County Bank and Skybank hold, respectively, first and second mortgages on the property securing obligations totaling approximately $165,000. At the Hearing, Mrs. Guikema testified that the Debtors intend to remain in the Residence and had negotiated reaffirmation agreements with the first and second mortgage holders. Debtors' combined monthly payment on these two mortgages approximates $1,650.

The schedules of assets and liabilities filed by the Debtors list total assets of $189,632 and total liabilities at $303,510. Debtors' liabilities include secured debt of $171,300 and $132,210 in unsecured indebtedness, consisting of $38,600 in priority tax debt owing to the Internal Revenue Service and the State of Ohio and $93,610 in nonpriority debt. More than two-thirds of the Debtors' nonpriority, unsecured debt is business-related, having been incurred in connection with Mr. Guikema's failed photography-shop venture.

In addition to the Residence, the Debtors list the following assets in their schedules:

| Asset | Value |
|---|---|
| Cash/bank accounts | $ 332 |
| Household goods | $ 1,800 |
| Family books and pictures | $ 100 |
| Clothing and bedding | $ 200 |
| Jewelry | $ 400 |
| Whole-life insurance | $ 1,100 |
| Annuity | $19,000 |
| Profit sharing plan account | $28,000 |
| Automobile | $ 2,000 |
| Camera equipment | $ 1,200 |
| Partnership bank account | $ 350 |
| Partnership business assets | $ 150 |
| Total . . . . . . . . . . . . | $54,732 |

*See* Schedule B—Personal Property.

Aside from the Residence, the only significant assets listed in the Debtors' schedules are the Annuity and Mrs. Guikema's interest in a profit sharing plan sponsored by Grady Memorial ("PSP Account"). The Annuity is a tax-sheltered retirement account valued at $19,194.90 as of March 31, 2004. Trustee Ex. 1.[1] AIG VALIC manages the Annuity, which is invested in a series of mutual funds on a percentage

1. At the conclusion of the Hearing, the Court directed the parties to supplement the record by providing account balances for the Annuity and the PSP Account as well as documentation establishing projected distributions to the Debtors at retirement from the Annuity, the PSP Account and Social Security. The Trustee filed a document entitled "Submission of Exhibits for Determination of Trustee's Objection to Claim of Exempt Property" (Doc. 35) ("Trustee's Submission"), which included the following exhibits:

Trustee

| Exhibit ("Ex.") | Document |
|---|---|
| 1 | Account statement for Mrs. Guikema as of March 31, 2004 for both the Annuity and PSP Account; |
| 2 | Annuity payment comparison (assuming distributions from the PSP Account only); |
| 3 | Annuity payment comparison (assuming distributions from both the PSP Account and Annuity); |
| 4 | Estimated Social Security benefits for Mrs. Guikema; and |
| 5 | Estimated Social Security benefits for Mr. Guikema. |

basis. *Id.* Mrs. Guikema contributed $100 a month to the Annuity during the first quarter of 2004 and has contributed $12,050 over the life of the Annuity. *Id.*

The PSP Account was valued at $28,834.92 as of March 31, 2004. *Id.* AIG VALIC also manages the PSP Account, which, like the Annuity, is invested in a series of mutual funds on a percentage basis. *Id.* All contributions to the PSP Account (aside from an initial $1,127.45 transfer to the account[2]) have come from Grady Memorial, which has contributed $20,125.20 to the PSP Account since its inception. During her 13–year tenure at the hospital, Grady Memorial has contributed an annual average of approximately $1,550 to the PSP Account. No suggestion was made at the Hearing that Grady Memorial would cease making these contributions to the PSP Account in the future.

## C. The Debtors' Current Income and Expenses

Debtors' Schedule I lists total, net monthly income of $3,714.36. Schedule I—Current Income of Individual Debtor(s). Their Schedule J lists the following monthly expenses:

| Expense | Amount |
| --- | --- |
| Rent or home mortgage payment | $ 800 |
| Utilities: Electricity and heating fuel | $ 250 |
| Water and sewer | $ 60 |
| Telephone | $ 120 |
| Home maintenance (Repairs and upkeep) | $ 50 |
| Food | $ 400 |
| Clothing | $ 75 |
| Laundry and dry cleaning | $ 50 |
| Medical and dental expenses | $ 250 |
| Transportation (not including car payments) | $ 200 |
| Recreation, clubs and entertainment, newspapers, magazines, etc. | $ 100 |
| Charitable contributions | $ 75 |
| Insurance: Life | $ 50 |
| Auto | $ 65 |
| Installment Payments: Auto | $ 180 |
| Other: Delaware County Bank, Second Mortgage | $ 850 |
| Other: School or work lunches | $ 125 |
| Other: Internal Revenue Service | $ 500 |
| TOTAL MONTHLY EXPENSES | $ 4,200 |

*See* Schedule J—Current Expenditures of Individual Debtor(s).

## D. The Debtors' Projected Future Income

According to the Trustee's Submission, at the time Mrs. Guikema reaches age 65 the Annuity and PSP Account will have, respectively, cash values of $25,798.94 and $40,316.83. Trustee Exs. 2 and 3.[3] The Trustee's Submission also reflects that at

---

**2.** The record is silent as to the source of this payment and the date it was made.

**3.** Two of the exhibits attached to the Trustee's Submission appear to have been mislabeled. Trustee Ex. 2 purports to set forth a projected future payment stream from the "Profit Sharing Plan only." But the projected $25,798.94 future value of the PSP Account (as of the date Mrs. Guikema reaches age 65) contained in Trustee Ex. 2 is approximately $3,000 less than its current value of $28,834.92, which makes no sense given the assumed annual growth rate of 2%. Thus, the projection set forth in Trustee Ex. 2 must have been intended to refer solely to the Annuity, given its current value of $19,194.30 and the assumed future annual growth rate of 2%. Similarly, the projected $40,316.83 value contained in Trustee Ex. 3, which purports to state the value of "both [the PSP Account] and [A]nnuity" (as of the date that Mrs. Guikema reaches age 65), is nearly $8,000 less than their combined, current value of $48,029.22. The projection contained in Trustee's Ex. 3 accordingly must have been intended to refer solely to the PSP Account, given its current value of $28,834.92 and assumed annual growth rate of 2%.

age 65 Mrs. Guikema will receive monthly distributions of $149.77 from the Annuity and $234.06 from the PSP Account. *Id.* The projections of the future values of the Annuity and the PSP Account and the anticipated distributions from these funds are conservative because they assume (1) an annual growth rate of only 2%; (2) no additional contributions to the Profit Sharing Plan will be made by Grady Memorial; and (3) no additional retirement savings by Mrs. Guikema. *Id.* The Trustee's Submission further provides that Mr. and Mrs. Guikema, upon reaching the age of 66, will receive monthly Social Security benefits of $1,138 and $1,675, respectively. Trustee Exs. 4, 5.

### III. Arguments of the Parties

The Trustee asserts that "no portion of the [Annuity is] reasonably necessary [for the Debtor's maintenance and support] pursuant to the standards established by the case law applying the [Ohio Exemption] [S]tatute." Objection at 1. Weighing against a finding that the Annuity is reasonably necessary, the Trustee argues, are the Debtors' age (both are in their early 50s and have nearly 15 years to work before retirement), their good health, the fact that they have no dependents, their anticipated retirement income (from both Social Security and the PSP Account) and their discharge of over $90,000 in unsecured debt.

The Debtors argue that the Ohio Exemption Statute was not intended to limit exemption claims by debtors—like the Guikemas—who have retirement assets totaling less than $50,000. Rather, they contend that the "reasonably-necessary-for-maintenance-and-support" limitation contained in both the Ohio and Federal Exemption Statutes was designed to thwart exemption claims made by high-salaried professionals and executives who accumulate substantial retirement assets and at-

tempt to evade the claims of their creditors by taking compensation in the form of retirement benefits instead of straight salary. Thus, the Debtors maintain that the Court need not undertake an analysis of the factors set forth in *Hamo*. Debtors argue, in the alternative, that application of the factors listed in *Hamo* warrants a finding that the Annuity is exempt in its entirety. Given their age and limited earning capacity, the Debtors have a less sanguine view than the Trustee of their ability to meet their financial needs at retirement. They assert that even the approximate $47,000 total value of the Annuity and the PSP Account will be "insufficient for reasonable support of [their] retirement needs." Response to Objection to Claim of Exemption, ¶ 1.

### IV. Legal Analysis

#### A. The Bankruptcy Estate

The filing of a petition under the Bankruptcy Code creates an estate consisting of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). *See Owen v. Owen,* 500 U.S. 305, 308, 111 S.Ct. 1833, 114 L.Ed.2d 350 (1991) ("An estate in bankruptcy consists of all the interests in property, legal and equitable, possessed by the debtor at the time of filing, as well as those interests recovered or recoverable through transfer and lien avoidance provisions."); *Forbes v. Lucas (In re Lucas),* 924 F.2d 597, 600 (6th Cir.), *cert. denied,* 500 U.S. 959, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991) ("The filing of a bankruptcy petition under Title 11 of the United States Code creates an estate comprised of 'all legal or equitable interests of the debtor as of the commencement of the case.'") (quoting 11 U.S.C. § 541(a)(1)). Here, there is no dispute that the Annuity is property of the Debtors' bankruptcy estate.

## B. Exemptions from the Estate

"Federal bankruptcy law allows a debtor to exempt some of his property—mainly basic necessities—from the bankruptcy estate. The exemptions can afford the debtor some economic and social stability, which is important to the fresh start guaranteed by bankruptcy." *Sheehan v. Morehead (In re Morehead),* 283 F.3d 199, 202–203 (4th Cir.2002) (citing *Williams v. U.S. Fid. & Guar. Co.,* 236 U.S. 549, 554–55, 35 S.Ct. 289, 59 L.Ed. 713 (1915)). *See* 11 U.S.C. § 522(b); *Rousey v. Jacoway,* —— U.S. ——, 125 S.Ct. 1561, 1565–66, 161 L.Ed.2d 563 (2005) ("To help the debtor obtain a fresh start, the Bankruptcy Code permits him to withdraw from the estate certain interests in property, such as his car or home, up to certain values.") (citations omitted); *Owen,* 500 U.S. at 308, 111 S.Ct. 1833 ("An exemption is an interest withdrawn from the estate (and hence from creditors) for the benefit of the debtor. Section 522 determines what property a debtor may exempt."); *Holland v. Star Bank, N.A. (In re Holland),* 151 F.3d 547, 548 (6th Cir.1998) ("The Bankruptcy Code allows debtors to exempt certain property from the bankruptcy estate."); *Storer v. French (In re Storer),* 58 F.3d 1125, 1127 (6th Cir.), *cert. denied,* 516 U.S. 990, 116 S.Ct. 520, 133 L.Ed.2d 428 (1995) ("Bankruptcy Code § 522(d) entitles debtors to exempt certain property from their bankruptcy estate."). Exemptions "give the debtors a so-called 'grubstake' to begin their fresh start and . . . act as a safety net, so that the debtor and his family are not completely impoverished due to creditor collection action or bankruptcy such that they become wards of the state." *In re Robinson,* 292 B.R. 599, 606 (Bankr.

S.D.Ohio 2003) (quoting *In re Sumerell,* 194 B.R. 818, 826 (Bankr.E.D.Tenn.1996)).

 Section 522(b)(1) of the Code offers debtors a choice between exempting the property specified in § 522(d) or exempting the property protected by federal non-bankruptcy law or state law "unless the State law that is applicable to the debtor . . . specifically does not so authorize." 11 U.S.C. § 522(b)(1). Ohio has chosen to "opt out" of the federal exemption scheme; thus, Ohio residents who file for bankruptcy relief, like the Debtors, are limited to the exemptions provided under law.[4] *See Storer,* 58 F.3d at 1127 ("Ohio has replaced the federal exemptions with its own state exemptions, which are those generally available to debtors under Ohio's general debtor-creditor law.").

## C. Burden of Proof in Exemption Litigation

 The party objecting to an exemption—here, the Trustee—has the burden of proving the objection is not properly claimed. *See* Fed. R. Bankr.P. 4003(b) ("A party in interest may file an objection to the list of property claimed as exempt . . . ."); *Robinson,* 292 B.R. at 612 n. 9. "The [T]rustee, as the objecting party, has the burden of producing evidence which rebuts the prima facie presumption that the exemption is correct." *In re Mann,* 201 B.R. 910, 915 (Bankr.E.D.Mich.1996) (citing *Lester v. Storey, (In re Lester),* 141 B.R. 157, 161 (S.D.Ohio 1991)). *See also In re Rhinebolt,* 131 B.R. 973, 975 (Bankr. S.D.Ohio 1991) ("The initial burden of producing evidence to rebut the propriety of a

---

4. Ohio Rev.Code Ann. § 2329.662 provides: Pursuant to the "Bankruptcy Reform Act of 1978," 92 Stat. 2549, 11 U.S.C.A. 522(b)(1), this state specifically does not authorize debtors who are domiciled in this state to exempt the property specified in the "Bankruptcy Reform Act of 1978," 92 Stat. 2549, 11 U.S.C.A. 522(d).
Ohio Rev.Code Ann. § 2329.662 (Anderson 2001).

claimed exemption rests on the objecting party.") (citing Fed. R. Bankr.P. 4003(c)).

 "A party objecting to claimed exemptions must prove that the exemption is not properly claimed by a preponderance of the evidence." *In re Roselle*, 274 B.R. 486, 490 n. 4 (Bankr.S.D.Ohio 2002) (citing Fed. R. Bankr.P. 4003(c)). *See also Hamo*, 233 B.R. at 723 ("The burden is on the trustee to establish, by a preponderance of the evidence, that the exemption should be disallowed."). "Upon the introduction of sufficient evidence to rebut the prima facie validity of the exemption, the burden shifts to the debtors to demonstrate that the exemption is proper." *Rhinebolt*, 131 B.R. at 975. If, however, "the trustee fails to carry the burden of proving by a preponderance of the evidence that the exemption should be disallowed, the exemption will stand." *Mann*, 201 B.R. at 915 (citing *In re Baumgardner*, 160 B.R. 572, 573–74 (Bankr.S.D.Ohio 1993)).

### D. The Ohio Exemption Statute

Debtors claim the Annuity is exempt under § 2329.66(A)(10)(b) of the Ohio Revised Code, which provides that:

> (A) Every person who is domiciled in this state may hold property exempt from execution, garnishment, attachment, or sale to satisfy a judgment or order, as follows:

> . . . . .

> (b) Except as provided in sections 3119.80, 3119.81, 3121.02, 3121.03, and 3123.06 of the Revised Code, *the person's right to receive a payment under any pension, annuity*, or similar plan or contract, not including a payment from a stock bonus or profit-sharing plan or a payment included in division (A)(6)(b) or (10)(a) of this section, *on account of*

*illness, disability, death, age, or length of service, to the extent reasonably necessary for the support of the person and any of the person's dependents*, except if all the following apply:

> (i) The plan or contract was established by or under the auspices of an insider that employed the person at the time the person's rights under the plan or contract arose.

> (ii) The payment is on account of age or length of service.

> (iii) The plan or contract is not qualified under the "Internal Revenue Code of 1986," 100 Stat.2085, 26 U.S.C. 1, as amended.

Ohio Rev.Code Ann. § 2329.66(A)(10)(b) (emphasis added).

 "An exemption claimed under Ohio Revised Code Section 2329.66(A)(10)(b) requires [a] three-part analysis: (1) a right to receive payment under an annuity or similar plan; (2) the payment must be on account of illness, disability, death, age, or length of service; and (3) the payment must be reasonably necessary for the support of the debtor or his dependents." *In re Meyers*, 139 B.R. 858, 862 (Bankr.N.D.Ohio 1992). The parties' dispute in this case centers on whether the Annuity is reasonably necessary for the Debtors' support.

### E. The "Reasonably–Necessary" Limitation

Both the Ohio and the Federal Exemption Statutes limit an exemption in retirement assets to the amount "reasonably necessary for the support of [the debtor and the debtor's dependents]." Ohio Rev. Code Ann. § 2329.66(A)(10)(b); 11 U.S.C. § 522(d)(10)(E).[5] But the phrase "reason-

---

5. Section 522(d)(10)(E) of the Bankruptcy Code provides, as follows:

(d) The following property may be exempted under subsection (b)(1) of this section:

ably necessary for the support of [the debtor and the debtor's dependents]" is not defined in either the Bankruptcy Code or the Ohio Revised Code. Because there is no legislative history for Ohio statutes,[6] Ohio bankruptcy courts have looked to the legislative history of the Federal Exemption Statute in determining the meaning of the reasonably-necessary limitation. *See In re Phillips*, 45 B.R. 529, 533 (Bankr. N.D.Ohio 1984) ("The Ohio statute does not provide a definition of reasonably necessary, therefore, the court looks to the legislative history [of the Federal Exemption Statute] and the case law to establish a standard.").

Debtors argue that both the legislative history of the Federal Exemption Statute and case law establish that the "reasonably necessary" language was designed to disallow exemption claims made by debtors with substantial retirement savings—which they define as $200,000 to $300,000 or more—and thus should not limit their exemption in the Annuity here. To fully address the Debtors' argument, an explanation of the sequence of events leading to the enactment of the Federal Exemption Statute is required. The bankruptcy court in *Warren v. Taff (In re Taff)*, 10 B.R. 101 (Bankr.D.Conn.1981) chronicled this history as follows:

. . . . .
(10) The debtor's right to receive—

. . . . .
(E) a payment under a stock bonus, pension, profitsharing, annuity, or similar plan or contract on account of illness, disability, death, age, or length of service, *to the extent reasonably necessary for the support of the debtor and any dependent of the debtor,* unless—
 (i) such plan or contract was established by or under the auspices of an insider that employed the debtor at the time the debtor's rights under such plan or contract arose;

In attempting to discover the origin of [the reasonably necessary] language, one is led first to the Report of the Commission on Bankruptcy Laws of United States, H.R.Doc.No. 93–137, 93rd Cong., 1st Sess. (1973). The Commission on Bankruptcy Laws (Commission) was established in 1970 by the Congress to study, analyze, evaluate and recommend changes in the bankruptcy laws of the United States. In 1973, it filed its report together with a proposed completely revised bankruptcy statute. Although previous bankruptcy laws had deferred to the states for the enactment of the exemptions to be allowed to a bankrupt in the state of his domicile, the Commission proposed a "federal" list of exemptions to be of nationwide application in place of the state exemptions. In § 4–503(c)(6) of its proposed bankruptcy act, the Commission allowed as exempt

before or after retirement, such rights as the debtor may have under a [profit sharing,] pension [stock bonus, annuity or similar plan] which is established for the primary purpose of providing benefits upon retirement by reason of age, health, or length of service ... to the extent ... the debtor's interest therein is reasonably necessary for the support of the debtor and his dependents.

(ii) such payment is on account of age or length of service; and
(iii) such plan or contract does not qualify under section 401(a), 403(a), 403(b), or 408 of the Internal Revenue Code of 1986.
11 U.S.C. § 522(d)(10)(E) (emphasis added).

**6.** *See Mascio v. Pub. Employees Ret. Sys. of Ohio*, 160 F.3d 310, 325 (6th Cir.1998) ("There is no legislative history per se for Ohio statutes."); *State v. Bryant*, 1998 WL 399863, at *4 (Ohio Ct.App. July 17, 1998) ("[T]here is no legislative history in Ohio, generally."); *In re Smith*, 5 B.R. 227, 229 (Bankr.S.D.Ohio 1980) (same).

Resolution of the problems of the standard of support to be sustained, and the effect of other resources of the debtor, was not provided for in the proposed bankruptcy act. While the Commission proposal was before Congress, the National Conference of Commissioners on Uniform State Laws promulgated in August, 1976 a Uniform Exemptions Act (UEA) which sought to conform state exemption laws generally to the Commission's proposals. Section 6 of the UEA followed the Commission's proposed list of exemptions except that UEA § 6(b) defined the phrase "property to the extent reasonably necessary for the support of [the debtor] and his dependents" to mean

> property required to meet the present and anticipated needs of the individual and his dependents as determined by the court after consideration of the individual's responsibilities and all the present and anticipated property and income of the individual, including that which is exempt.

The Bankruptcy Code of 1978 wound its way through Congress until the day of enactment in two separate versions—one in the House and one in the Senate. When in 1977, the House Judiciary Committee reported out its version of a new bankruptcy law, it included an option for a debtor to choose either state law exemptions or the federal exemptions. In its list of federal exemptions, the House Bill exempted pension plans *without* limitation. The *House Report* No. 95–595, 95th Cong. 1st Sess. (1977), 361..., U.S.Code Cong. & Admin.News 1978, pp. 5787, 6317 noted as to the

federal exemptions: "They are derived in large part from the Uniform Exemption Act, promulgated by the Commissioners of Uniform State Laws in August, 1976." The Senate Judiciary Committee's version of a new bankruptcy law retained the former law's policy of looking only to state law for exemptions and omitted alternative federal exemptions. In the compromise measure which was enacted by Congress in 1978 to become the present law, the option provision in the House version for the debtor to choose between exemption systems was retained, and the "reasonably necessary" language was inserted with respect to pension plans [and other retirement assets].

*Id.* at 105–06 (emphasis added) (footnote omitted).

As the *Taff* court explained, the statute proposed by the Commission on Bankruptcy Laws ("Commission") was not enacted. Nevertheless, a law review article written by a consultant to the Commission has been cited by one bankruptcy court as authority for the proposition that the reasonably-necessary limitation contained in the Federal Exemption Statute was aimed at the circumstance in "which an officer of a large corporation or a professional person could accrue very large vested pension benefits beyond that which would be reasonably necessary for their support." *In re Miller,* 33 B.R. 549, 553 & n. 10 (Bankr. D.Minn.1983) (citing William T. Plumb, Jr., *The Recommendations of the Commission on the Bankruptcy Laws—Exempt and Immune Property,* 61 Va. L.Rev. 1, 59 (1975)).[7] The law review article cited by

---

7. Several other reported decisions also have cited the law review article relied on by the *Miller* court, but not as support for the proposition that Congress included the reasonably-necessary limitation in the Federal Exemption Statute in order to prevent high-earning executives and professionals from placing substantial retirement assets beyond the reach of creditors. These decisions simply note that one legal commentator has suggested that the reasonably-necessary limitation contained in the Commission's proposed exemption statute

the *Miller* court discussed the exemption statute proposed by the Commission, which contained a reasonably-necessary-for-maintenance-and-support limitation, and noted that this language was included "because of the well-known fact that a corporate officer or member of a professional corporation may be entitled to vested pension benefits aggregating hundreds of thousands of dollars." Plumb, 61 Va. L.Rev. at 59 (quoting Commission note 8 to Proposed Bankruptcy Act § 4–503, which states that the reasonably-necessary limitation was "placed on the exemption since it is recognized that members of professional corporations and officers will have very substantial benefits.") (citing S.Rep. No. 91–552, 91st Cong., 1st Sess. 201, 271 (1969), U.S.Code Cong. & Admin.News 1969, 2027, 2298).

Contrary to the Debtors' contention, neither the express terms or the legislative history of the Federal Exemption Statute support the conclusion that the "reasonably necessary" language contained in the statute was aimed primarily at high earners who have accumulated hundreds of thousands of dollars in retirement funds. True, the reasonably-necessary limitation did emanate from the exemption statute proposed by the Commission. And it is true also that note 8 to the Commission's proposed exemption statute states that the reasonably-necessary limitation was directed at "members of professional corporations and [corporate] officers" having "very substantial benefits." *Id.* But the

text of the Commission's proposed exemption statute did not define the phrase "reasonably necessary for the maintenance and support of the debtor and his dependents" or otherwise suggest that this limitation should apply only to high earners. More importantly, there is absolutely no indication in the legislative history accompanying the version of the Federal Exemption Statute that actually became law that the reasonably-necessary limitation was aimed primarily at high earners. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 361–62 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6317–18. Indeed, the legislative history accompanying the Federal Exemption Statute makes no mention of either the Commission's proposed exemption statute or its concern that high-earning corporate executives and professionals could shield unneeded assets from creditors absent a limitation on the exemptibility of retirement assets. *See id.*

Rather than referencing the Commission's proposed exemption statute and accompanying notes, the Federal Exemption Statute's legislative history simply indicates that the federal exemptions were "based on the Uniform Exemptions Act [('UEA')], promulgated by the Commissioners of Uniform State Laws in 1976." *Gilbert v. Osburn, (In re Osburn),* 56 B.R. 867, 875 (Bankr.S.D.Ohio 1986) (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 361 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6317). "Section 6[b] of the [UEA]

---

was directed at high earners who have amassed substantial retirement assets. *See In re Kochell,* 732 F.2d 564, 565 (7th Cir.1984) ("One commentator has suggested that the limitation was added to prevent officers of large corporations and professionals from placing large amounts of their assets into pension funds that would remain unavailable to their creditors, despite the fact that the individual might not have any real need for the assets.") (citing Plumb, 61 Va. L.Rev. at

58–59). *Samore v. Graham (In re Graham),* 726 F.2d 1268, 1272 (8th Cir.1984) ("It was with private plans particularly in mind that the Commission on Bankruptcy Laws proposed the reasonable support limitation, because of the well-known fact that a corporate officer or a member of a professional corporation may be entitled to vested pension benefits aggregating hundreds of thousands of dollars.") (quoting Plumb, 61 Va. L.Rev. at 59).

defined the phrase 'property to the extent reasonably necessary for the support of [the debtor] and his dependents' as 'property required to meet the present and anticipated needs of the individual and his dependents as determined ... after consideration of the individual's responsibilities and all of the present and anticipated property and income of the individual, including that which is exempt.'" *Id.* (citing *Kochell,* 732 F.2d at 565; *Phillips,* 45 B.R. at 533). As a leading bankruptcy treatise notes, "this standard does not focus on 'the debtor's station in life and the standard of living to which he has been accustomed,' as does the standard generally applicable to alimony and support." 2 William L. Norton, Jr., *Norton Bankruptcy Law and Practice 2d* § 46:8 (1998) (quoting UEA, Comment 7 to § 6, 13 U.L.A. Civ. Proc. & Rem. Laws 226 (1986)). "Rather, the [UEA] 'requires the court to direct its attention to the individual's needs and responsibilities.'" *Id.* (footnote omitted). "Given the evolutionary relationship between the [UEA] and the Code, this definition carries great weight." *Id.* (footnote omitted).

■ Because the legislative history of the Federal Exemption Statute states that the federal exemptions are derived from the UEA, courts have looked to the definition of reasonably-necessary property contained in § 6[b] of the UEA and its accompanying Comment 7 for guidance in interpreting the "reasonably necessary" language contained in the statute. *See, e.g., Kochell,* 732 F.2d at 565 ("[T]he reasonably necessary standard requires that the court take into account other income and exempt property of the debtor, present and anticipated ... and that the appropriate amount to be set aside for the debtor ought to be sufficient to sustain basic needs, not related to his former status in society or the lifestyle to which he

is accustomed but taking into account the special needs that a retired and elderly debtor may claim.") (quoting *Taff,* 10 B.R. at 107); *In re Flygstad,* 56 B.R. 884, 889–890 (Bankr.N.D.Iowa 1986) (same). Courts applying the Ohio Exemption Statute have likewise employed this basic-needs analysis, determining whether retirement benefits are reasonably necessary for a debtor's support not by looking to "whether he has sufficient funds to sustain his former lifestyle, but [instead] whether he has enough to sustain his present and future needs, taking into account any special needs of the particular debtor." *Hamo,* 233 B.R. at 723. "In determining what payments are 'reasonably necessary', th[is] Court does not have to decide whether a debtor has sufficient funds to sustain a former lifestyle. Instead, the inquiry is whether there is enough to sustain present and future needs, taking into account any special circumstances." *Roselle,* 274 B.R. at 490 (citing *Hamo,* 233 B.R. at 723; *In re Parker,* 219 B.R. 972, 974–75 (Bankr.S.D.Ohio 1998)); *In re Erbaugh,* 199 B.R. 367, 368 (Bankr.S.D.Ohio 1996) ("[T]he appropriate amount to be set aside for the debtor ought to be sufficient to sustain basic needs, not related to his former status in society or the lifestyle to which he is accustomed but taking into account the special needs that a retired and elderly debtor may claim.").

■ In order to determine whether any or all of the Annuity is reasonably necessary for the Debtors' support, the Court "must consider both the present and future needs of the debtors." *Parker,* 219 B.R. at 974 (citing *In re Bogart,* 157 B.R. 345, 347 (Bankr.N.D.Ohio 1993)). The Court "must look to the time when both husband and wife will be in retirement[,]" *id.* at 975, and make its determination based on the facts existing on the date the

Debtors filed their petition.[8] As the BAP explained in *Hamo,* "[b]ankruptcy courts uniformly consider eleven factors in making the determination of the amount of retirement funds necessary to sustain a debtor's needs." *Hamo,* 233 B.R. at 723. These factors ("Necessity Factors") include:

1. Debtors' present and anticipated living expenses;

2. Debtors' present and anticipated income from all sources;

3. Age of the debtors and dependents;

4. Health of the debtors and dependents;

5. Debtors' ability to work and earn a living;

6. Debtors' job skills, training, and education;

7. Debtors' other assets, including exempt assets;

8. Liquidity of other assets;

9. Debtors' ability to save for retirement;

10. Special needs of the debtors and dependents; [and]

11. Debtors' financial obligations, e.g., alimony or support payments.

*Id. See also In re Conkle,* 275 B.R. 530, 531 (Bankr.S.D.Ohio 2002) (applying Necessity Factors and "determining [that] annuity is [not] reasonably necessary for the support of the debtors") (citing *Mann,* 201 B.R. at 915–16; *Parker,* 219 B.R. at 975); *Erbaugh,* 199 B.R. at 369 (determining individual retirement account was rea-

sonably necessary based on application of Necessity Factors); *In re Webb,* 189 B.R. 144, 145–146 (Bankr.S.D.Ohio 1995) (same); *Mid–Am. Fed. Sav. & Loan Ass'n v. Gateway Manor Congregate Apts.,* 94 Ohio App.3d 521, 641 N.E.2d 229, 233 (1994) (applying Necessity Factors and holding that Keogh plan was not reasonably necessary for judgment debtor's support and thus not exempt from garnishment).

"A bankruptcy court's analysis is not restricted to the[ ] [Necessity] [F]actors, nor is a bankruptcy court required to specifically discuss each factor in every case. However, these factors are appropriate for a trial court's consideration in its analysis of the totality of facts and circumstances in each case." *Hamo,* 233 B.R. at 723. *See also Roselle,* 274 B.R. at 490 ("When analyzing the facts and circumstances of each case, the [c]ourt is not restricted to these factors, nor is the court required to specifically address each factor.").

### F. Application of the Necessity Factors

#### 1. Present/Future Income & Expenses (Necessity Factors 1, 2) Ability to Save for Retirement (Necessity Factor 9)

The Debtors' lifestyle is by no means lavish. Together, they net $3,714 in monthly income, and they estimate their monthly expenses at $4,200, resulting in a monthly budget shortfall of nearly $500. *See* Schedule I—Current Income of Indi-

---

**8.** "The right to claim an exemption from property of the bankruptcy estate arises and is fixed in a voluntary case on the date the petition is filed." *In re Lude,* 291 B.R. 109, 110 (Bankr.S.D.Ohio 2003) (citing *Armstrong v. Peterson (In re Peterson),* 897 F.2d 935 (8th Cir.1990)). "Changes in either a debtor's factual circumstances or the law after the petition date do not change the status of an exemption properly claimed as of the petition

filing date." *Id.* (citing *Peterson,* 897 F.2d at 937–938). "Ohio law holds that in bankruptcy, a debtor's eligibility for an exemption must be gauged from the time the debtors' joint bankruptcy petition is filed, and as a consequence, later changes that occur in a debtor's set of circumstances are ignored." *In re Greer,* 242 B.R. 389, 398 (Bankr. N.D.Ohio 1999) (citations omitted).

vidual Debtor(s); Schedule J—Current Expenditures of Individual Debtor(s). Most of the Debtors' income is obtained from Mrs. Guikema's $60,000 a year position as a registered nurse, a job she has held for 13 years. While Mrs. Guikema has no plans to pursue a managerial position at Grady Memorial, which, she testified, would result in a significant pay raise, she does expect to receive modest yearly pay raises until her planned retirement in 15 years when she reaches age 65. Mr. Guikema nets $300 a month from his current photography work. He testified that he continues to search for more lucrative employment. Mr. Guikema has substantial experience as a photographer and also worked at Cord Camera for several years. His income has the potential to increase substantially if he obtains a position similar to that which he held at Cord Camera but likely will not decrease in the future.

Although Debtors' living expenses exceed their income by nearly $500 a month, they could eliminate this shortfall by reducing their $2,010 in total monthly housing-related expenditures—which is the one item in the Debtors' budget that appears to be clearly out of line considering their income level. Debtors' total monthly housing-related costs, which consume nearly 60% of their total monthly income, include the following items.

| | |
|---|---|
| Home mortgage | $ 800 |
| Second mortgage | $ 850 |
| Electricity and hearing fuel | $ 250 |
| Water and sewer | $ 60 |
| Home maintenance | $ 50 |
| Total | $2010[9] |

These expenses would be reduced significantly by relocation to an apartment. Debtors could certainly find suitable housing in the Delaware, Ohio area for no more than $1,000 per month by simply moving to an apartment in their community. A reduction in their housing-related expenditures by approximately $1,000 a month would result in the elimination of Debtors' current $500 monthly budget shortfall and allow them to save or invest the remaining $500 a month in savings for their retirement needs.

■ As discussed above, in assessing whether the Annuity is reasonably necessary for the support of the Debtors, the Court must look to whether the Debtors can sustain their basic needs, not whether they can maintain their former status in society or the lifestyle to which they were accustomed. *See, e.g., Hamo,* 233 B.R. at 723; *Roselle,* 274 B.R. at 490; *Parker,* 219 B.R. at 975; *Erbaugh,* 199 B.R. at 368. By obtaining more affordable housing, Debtors will be able to sustain their basic needs and save substantial sums for their retirement. *See Roselle,* 274 B.R. at 490–491 (concluding that debtor's entire $2,453.30 monthly disability insurance benefit was not reasonably necessary based, in part, on finding that debtor's housing expenses could be substantially reduced by his relocation to an apartment). The Debtors undoubtedly would prefer to stay in their current residence. But, in determining whether the Annuity is reasonably necessary, the Court is not permitted to consider Debtors' former station in life. *See Kochell,* 732 F.2d at 566; *Phillips,* 45 B.R. at 534; *Taff,* 10 B.R. at 107. Simply put, "the fresh start guaranteed by bankruptcy, and supported by the exemption scheme, does not entitle a debtor to maintain the lifestyle to which he was accus-

---

9. Line items for real estate taxes and homeowners' insurance are not included in Debtors' Schedule J. It is therefore unclear whether or not the $1650 in total mortgage payments includes real estate taxes and homeowners' insurance. Thus, if Debtors' real estate taxes and insurance are not escrowed and paid by their mortgage holder, their monthly housing-related costs may actually exceed $2010.

tomed in better times." *Morehead,* 283 F.3d at 207.[10]

Further, the Debtors' future income should be sufficient to sustain their basic needs. Estimates from the Social Security Administration show that Debtors, collectively, will receive $2,813 in monthly benefits upon their retirement, Trustee Exs. 4, 5, and that Mrs. Guikema will receive an additional $234.06 per month upon retirement from her PSP Account. Trustee Ex. 3. The monthly payment Mrs. Guikema is projected to receive from the PSP Account assumes a mere 2% rate of growth and that Grady Memorial will make no future contributions to the plan. This latter assumption does not appear reasonable given the fact that Grady Memorial has contributed a yearly average of $1,550 to her PSP Account over the past 13 years. If this contribution level were to continue for another 15 years, Mrs. Guikema's interest in the PSP Account would increase by at least $23,250 (which does not include a rate of return on the additional contributions). Thus, it is reasonable to assume that the monthly distribution Mrs. Guikema will receive from the PSP Account at retirement will be in excess of that projected in Trustee Ex. 3. More importantly, if Debtors decrease their monthly housing costs, they will be able to save substantial sums over

the course of their remaining work lives and use these savings to help fund their retirement needs.[11]

## 2. The Remaining Necessity Factors

▪ The remaining Necessity Factors are either neutral or weigh against a finding that the Annuity is reasonably necessary for the Debtors' support. Mr. Guikema (age 52) and Mrs. Guikema (age 50) have, respectively, 13 and 15 years to work before reaching the age of 65. (Necessity Factor 3). Thus, while they are not on the threshold of retirement, they have a limited time to work and save for retirement before reaching age 65. But, as discussed above, with reasonable budgetary adjustments, the Debtors should have sufficient time to replace the Annuity and accumulate additional retirement savings. Debtors have adequate job skills and training to remain employed until at least age 65. (Necessity Factors 5 and 6). The Debtors have no significant assets—liquid, or otherwise—other than the Annuity, Profit Sharing Plan and their Residence, which is over-encumbered. (Necessity Factors 7 and 8). The Debtors have no dependents, as their children are both married and currently attend graduate school. (Necessity Factors 4 and 10).[12]

---

**10.** As a practical matter, Debtors' ability to reduce their housing costs will be complicated by their execution of reaffirmation agreements with their first and second mortgage holders. But the fact that the Debtors may have made an ill-advised, postpetition decision to reaffirm their mortgage obligations cannot factor into the Court's analysis of whether the Annuity is reasonably necessary for the Debtors' maintenance and support. "[A] debtor's eligibility for an exemption must be gauged from the time the debtors' joint bankruptcy petition is filed, and as a consequence, later changes that occur in a debtor's set of circumstances are ignored." *Greer,* 242 B.R. at 398.

**11.** If the Debtors reduce their monthly housing costs by $1,000 and save $500 a month over the remaining 15 years of Mrs. Guikema's work life, they will have at least an additional $90,000 (plus more, assuming even a modest rate of return on the additional savings) when Mrs. Guikema reaches age 65.

**12.** Adult non-dependents do not figure in the Court's determination whether the Annuity is reasonably necessary for the support of the Debtors. "[A]lthough [Ohio Rev.Code Ann.] § 2329.66(A)(10)(b) permits the exemption of the amount reasonably necessary for the support of Debtor and his dependents, the court may not permit the exemption of an amount expended on behalf of an adult child that is not a dependent." *Hunter v. Ohio Citizens*

Courts often base a determination that retirement assets are reasonably necessary for the maintenance and support of debtors and their dependents on debtors' health-related problems and their resultant inability to work. "The special needs of retired, infirm and elderly debtors should be taken into account." *In re Donaghy*, 11 B.R. 677, 680 (Bankr.S.D.N.Y. 1981) (finding that 62 year-old debtor had established that a $21,992.87 pension plan payment was reasonably necessary for his support under Federal Exemption Statute based upon his and his 64 year-old wife's poor health and their combined inability to work). *See also Parker*, 219 B.R. at 975–76 (finding that entire amount of $20,733 IRA was reasonably necessary for the support of 67 year-old debtor due to his deteriorating health, age, and level of education, which put into question his ability to work or contribute to his retirement account); *Bogart*, 157 B.R. at 348 (finding that a 58 year-old debtor, presently on medical leave and with a $130 monthly pension, who will retire in two years and is unlikely to gain other employment, is permitted to exempt a $5,545 IRA account but must turn over $2,083 in another IRA account). In this case, however, the Debtors have testified to no health problems or any other special needs. (Necessity Factors 4 and 10). *See Silagy v. Bank One, Akron, N.A. (In re Collin)*, 182 B.R. 763, 767 (Bankr.N.D.Ohio 1995) ("Unlike *Donaghy*, the Debtor in this case has not presented any special needs related to age or infirmity for the court to consider.").

## V. Conclusion

For these reasons, the Court concludes that the Trustee has shown by a preponderance of the evidence that the Annuity is not reasonably necessary for the Debtors'

maintenance and support and thus may not be exempted under Ohio Rev.Code Ann. § 2329.66(A)(10)(b). A separate order sustaining the Trustee's Objection to Mrs. Guikema's claim of exemption in the Annuity will be entered.

**IT IS SO ORDERED.**

*Bank (In re Hotchkiss)*, 93 B.R. 546, 548–549 (Bankr.N.D.Ohio 1988) (citing *In Re Bari*, 43 B.R. 253, 256 (Bankr.D.Minn.1984); *In Re Fill*, 84 B.R. 332, 339 (Bankr.S.D.N.Y.1988)).